IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY N. CARR, SR., *on behalf of himself and all others similarly situated*, | : : : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : : : | NO. 22-2139 |
| REGULATORY DATACORP, INC. and BUREUA VAN DIJK ELECTRONIC PUBLISHING, INC., | : : : : | |
| Defendants. | : | |

<u>MEMORANDUM</u>

**Perez, J.**                                                                                                         **August 26, 2024**

      Plaintiff Jeffrey N. Carr, Sr. brings this putative class action against Defendants Regulatory Datacorp, Inc. and Bureau Van Dijk Electronic Publishing, Inc. (collectively, "Defendants"), alleging claims under Sections 1681e(b), 1681e(c), and 1681g of the Fair Credit Reporting Act ("FCRA"), along with claims for negligence and tortious interference. Currently before the Court is Plaintiff's motion to certify a class for only the Section 1681e(c) claim. For the reasons that follow, the Court denies the motion.

**I.      BACKGROUND**

      Defendants provide their customers, predominately financial institutions, a compliance service known as Global Regulatory Information Database ("GRID"). ECF 73-2 at 24:15-20. GRID aims to assist customers in complying with Anti-Money Laundering, Know Your Customer, and other regulatory frameworks. *See id.* at 25:4-19. Pulling from a range of publicly available

sources, GRID provides these institutions with tools to screen current and prospective customers by collecting adverse media, sanctions, watchlists, and similar information about individuals and entities. *See* https://www.bvdinfo.com/en-us/ourproducts/data/international/grid. The financial institutions submit search terms regarding their customers to GRID (such as an individual's name or address, for example), and GRID provides any responsive information in the form of a report ("GRID report"). *See* ECF 73-2 at 42:16-43:7. The financial institutions typically use this information to determine whether they should do business with the current or prospective customer. *Id.* at 28:4-19.

In July 2020, one of Defendants' customers, Capital One, queried the name "Jeffrey Carr" and a date of birth into GRID. *Id.* at 142:21-143:12. A GRID report was issued to Capital One that included an article published in the Virginia Lawyers' Weekly regarding an individual named Jeffrey Carr who had been convicted of various trafficking offenses in 2018. ECF 72-11. In August 2020, Capital One closed Plaintiff's account based on the mistaken belief that the trafficking convictions were Plaintiff's; in reality, the convictions belonged to his son Jeffrey Nigel Carr, Jr. ECF 73-6 at 3:14-16; ECF 73-10 at 10:10-22; ECF 73-3 at 71:2-72:5. Plaintiff received a letter from Capital One dated September 1, 2020, stating that the account was closed because "Capital One has discovered adverse past or present legal action involving an individual or entity associated with the account." ECF 73-9. The letter did not indicate what the legal action was, explicitly stating that "we are not able to offer additional information about this decision." *Id.*

After the account closure but before receiving the letter, Plaintiff contacted Capital One to learn why his account was closed. ECF 73-6 at 2:10-3:14:20. A Capital One representative explained: "[w]e have some information about convicted of sex trafficking, conspiracy to commit sex trafficking, abduction, conspiracy, and use of a firearm in the commission of abduction." *Id.*

at 6:20-7:1. Plaintiff responded: "That's totally not me" and insisted that Capital One had the wrong information. *Id.* at 7:3-6. The next day, Plaintiff called Capital One back and explained: "You know, what you're reading to me and what you're telling me, it's not me. It's actually my son, as I figured it out finally last night, because my son has my same name. . . . And I don't know how they linked all of that together . . . I don't even know how they got his information[.]" ECF 73-7 at 3:3-11. Plaintiff informed Capital One that he is uninterested in reopening his account and will never do business with Capital One again. ECF 73-6 at 8-18-19.

Capital One never revealed to Plaintiff the existence of the GRID report, the Virginia Lawyers' Weekly article, nor Defendants' role in furnishing the report. In addition to this lawsuit, Plaintiff brought a separate suit against Capital One. *See* ECF 72-16 at 3. Through litigation, Plaintiff discovered that Defendants entered into a contract with Capital One that prohibits Capital One from disclosing the GRID report or its source to customers. *See, e.g.,* ECF 72-8 (contract providing that "any alerts or other reports provided by [Defendants] shall not be disclosed to anyone other than [Capital One]."); ECF 72-4 at 104:19-105:17 (deposition transcript confirming that the contract prohibits Capital One from disclosing "information about [Defendants] or GRID" to its customers). Plaintiff also learned that Defendants sent the same GRID report at issue here to nineteen other business. *See* ECF 72-17 at Response No. 3.

Now, Plaintiff alleges that Defendants violated Section 1681e(c) of the FCRA, which provides:

> A consumer reporting agency may not prohibit a user of a consumer report furnished by the agency on a consumer from disclosing the contents of the report to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report.

15 U.S.C. 1681e(c).

In relation to the Section 1681e(c) claim, Plaintiff seeks to certify the following class:

> All natural persons with an address in the United States and its Territories about whom Defendants communicated a GRID report to Capital One, N.A. between September 14, 2018 and the date of the class certification order, and whose Capital One, N.A. account(s) were closed in whole or in part based upon information in the GRID report.

ECF 72-1 at 13.

## II.     LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Federal Rule of Civil Procedure 23 governs class certification. Under Rule 23, a plaintiff seeking class certification must satisfy the four requirements of Rule 23(a) in addition to one subsection of Rule 23(b). *See* Fed. R. Civ. P. 23. Rule 23(a) requires: (1) numerosity; (2) commonality; (3) typicality; and (4) adequate representation. *Id.* If a plaintiff makes the requisite showing under Rule 23(a), then he must proceed to Rule 23(b)(1), (b)(2), or (b)(3). *Id.*

Here, Plaintiff seeks certification pursuant to Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* Plaintiffs proceeding pursuant to Rule 23(b)(3) must also show that the class is ascertainable. *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013). After all, "[i]f a class cannot be ascertained in an economical and 'administratively feasible' manner, significant benefits of a class action are lost." *Id.* at 307.

Class certification requires "[a] rigorous analysis" that "calls for findings by the court, not merely a threshold showing by a party, that each of the requirements of Rule 23 is met." *Ferreras v. Am. Airlines, Inc.,* 946 F.3d 178, 183 (3d Cir. 2019). Plaintiffs must prove each Rule 23 requirement by a preponderance of the evidence. *See Carrera*, 727 F.3d at 306.

## III.     DISCUSSION

### A.     Standing

To begin, Defendants argue that Plaintiff lacks standing to bring a claim under Section 1681e(c). Article III standing requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Plaintiff asserts that he suffered an informational injury because he was deprived of information to which he was entitled under Section 1681e(c). "[A] plaintiff seeking to assert an informational injury must establish a nexus among the omitted information to which []he has entitlement, the purported harm actually caused by the specific violation, and the 'concrete interest' that Congress identified as 'deserving of protection' when it created the disclosure requirement." *Kelly v. RealPage Inc.*, 47 F.4th 202, 213 (3d Cir. 2022). Broken down into elements, a cognizable informational injury exists where (1) there is an omission of information to which plaintiff is legally entitled; (2) adverse effects flowed from that omission; and (3) the adverse effects have a nexus to the concrete interest Congress sought to protect in enacting the statute. *Id.* at 214.

Defendants contend that Plaintiff has not established the first element because he never affirmatively requested the allegedly omitted information. However, unlike other provisions of the FCRA, there is nothing in the statutory text to indicate that Section 1681e(c) requires plaintiffs to make an affirmative request for information. *Cf.* 15 U.S.C. § 1681g(a) (requiring consumer reporting agencies to disclose specific information "*upon request*" (emphasis added)). Rather, Section 1681e(c) proscribes consumer reporting agencies ("CRAs") from prohibiting users of

consumer reports from disclosing the contents of the reports to consumers if the user took adverse action against the consumer based on information contained in the report. This is precisely what Plaintiff alleges Defendants did by way of a contract with Capital One. *See, e.g.,* ECF 72-8 (contract providing that "any alerts or other reports provided by [Defendants] shall not be disclosed to anyone other than [Capital One]."); ECF 72-4 at 104:19-105:17 (deposition transcript confirming that the contract prohibits Capital One from disclosing "information about [Defendants] or GRID" to its customers). In fact, Defendants admit that Capital One at least failed to disclose to Plaintiff that it "had obtained this public information through [Defendants'] GRID database." ECF 73 at 15. The Court also finds that Capital One did not disclose the existence of the GRID report nor its full contents, including the Virginia Lawyers' Weekly article.

Next, Defendants argue that Plaintiff failed to show that any omission of information led to adverse effects with a nexus to the interest Congress sought to protect. In enacting the FCRA, Congress sought to address "'the inability at times of the consumer to know he is being damaged by an adverse credit report'" and "the lack of 'access to the information in his file[.]'" *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting S. Rep. No. 91-517, at 3 (1969) ("Senate Report")). Section 1681 specifically aims to promote "fair and accurate credit reporting." 15 U.S.C. § 1681. As the Third Circuit has recognized, "[a] consumer cannot know *ex ante* the source of a potential error in their file, whether an underlying source of the CRA itself is responsible for the error, or what may be required to obtain a correction." *Kelly*, 47 F.4th at 215.

The *Kelly* court continued, "[i]t is therefore enough for standing purposes for plaintiffs to allege that, as a result of an omission, they experienced the adverse effects of being 'unable to . . . ensure fair and accurate reporting of their credit information.'" *Id.* Here, Plaintiff argues that Defendants' omission resulted in him not knowing the existence and contents of the GRID report.

Plaintiff had no knowledge of the Virginia Lawyers' Weekly article relied upon in the GRID report, did not know Defendants provided the GRID report to Capital One, and therefore had no way of knowing what might be necessary to resolve the error. Without disclosure of this information, Plaintiff was not privy to information in his file and was unable to ensure the fair and accurate reporting of his credit information. Indeed, it was not until discovery was exchanged in this lawsuit that Plaintiff received a copy of the GRID report and learned that Defendants issued the same GRID report to nineteen other businesses in response to searches submitted for "Jeffrey Carr." *See* ECF 72-17 at Response No. 3 (providing a list of third parties to whom the same GRID report was sent).

Thus, in light of the foregoing, the Court concludes that Plaintiff has demonstrated Article III standing.

### B. Class Certification

Plaintiff seeks to certify the following class:

> All natural persons with an address in the United States and its Territories about whom Defendants communicated a GRID report to Capital One, N.A. between September 14, 2018 and the date of the class certification order, and whose Capital One, N.A. account(s) were closed in whole or in part based upon information in the GRID report.

ECF 72-1 at 13.

The Court will begin its analysis with the prerequisites—Rule 23(a)'s requirements and ascertainability. If Plaintiff meets the prerequisites, the Court will then assess whether Plaintiff satisfied Rule 23(b)(3). Notably, Defendants challenge only whether Plaintiff has established numerosity, adequacy as a class representative, ascertainability, and predominance.

        **1.**       **Rule 23(a) Requirements**

          **a.**       **Numerosity**

Rule 23(a)'s numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The burden for showing numerosity is relaxed "when the potential number of class members exceeds forty." *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 896 (3d Cir. 2022). However, "[t]his is a guidepost: showing the number of class members exceeds forty is neither necessary nor sufficient." *Id.* "When plaintiffs cannot directly identify class members, they 'must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding.'" *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 590, 596 (3d Cir. 2012)). "Only then may the court rely on 'common sense' to forgo precise calculations and exact numbers." *Id.* Further, "where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." *Id.*

Plaintiff argues there are over 19,000 putative class members because Capital One identified 19,331 account closures "that were based at least in part on information from [Defendant's] GRID reports or on similar information from another source." ECF 72-18 at ¶ 6. Of those 19,331 account closures, Plaintiff has not identified which were closed based on GRID reports and which were closed based "on similar information from another source." The record indicates that at least some of the closures were not based on a GRID report at all, but "Capital One has not been able to determine the exact number of accounts that were closed based at least in part on a source other than . . . GRID reports[.]" ECF 72-18 at ¶ 7.

Moreover, the proposed class is limited to "natural persons," but the 19,331 closures are accounts. It is unclear how many of the 19,331 accounts have the same owner, but it is likely that, within the 19,311 accounts, there are individual account owners who experienced multiple account closures. ECF 73-4 at 38:19-39:7. It is also unclear how many of the 19,331 accounts were owned by business entities rather than individuals, although the proposed class covers only natural persons. *Id.* at 39:17-23. Lastly, the proposed class is limited to "natural persons with an address in the United States and its Territories," but there is no indication that the 19,331 accounts that were identified were limited to this geographic area.

Notwithstanding these facts, Capital One "believes that a substantial number of these accounts were closed based at least in part on information from . . . GRID reports." ECF 72-18 at ¶ 7. Plaintiff, however, provides no basis for determining what portion of the 19,331 account closures actually belonged to natural persons with addresses in the United States or its Territories. In short, Plaintiff asks this Court to infer numerosity from the larger pool of 19,331 account closures, which it cannot do. Based on the evidence presented, Plaintiff has not demonstrated numerosity by a preponderance of the evidence.

### b. Commonality and Typicality

"The concepts of typicality and commonality are closely related and often tend to merge." *Marcus*, 687 F.3d at 597. Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "For purposes of Rule 23(a)(2), even a single common question will do." *Marcus*, 687 F.3d at 597. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[R]elatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of

conduct." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016).

Defendants do not contest whether Plaintiff met the commonality and typicality requirements, and the Court finds that Plaintiff satisfied both. Plaintiff and the proposed class share several common questions, including whether the GRID reports constitute "consumer reports" under the FCRA; whether Defendants violated Section 1681e(c) by prohibiting the disclosure of the GRID reports and their contents; and whether any violation of Section 1681e(c) was willful. Similarly, Plaintiff's claims are typical of the proposed class because, like all proposed class members, Plaintiff had an open Capital One account and was the subject of a Capital One inquiry to Defendants. Defendants then sent a GRID report to Capital One in response to the inquiry, and based upon the information in the GRID report, Capital One closed Plaintiff's account. It is widely accepted that "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d at 428. Plaintiff has therefore satisfied Rules 23(a)(2) and 23(a)(3).

### c. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy of representation requirement "tests the qualifications of class counsel and the class representatives." *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d at 428. "It also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented . . . ." *Id.*

It is undisputed that Plaintiff selected class counsel who is qualified and experienced in class action litigation. *See* ECF Nos. 72-20, 72-21, 72-22 (attorney and firm biographies). Defendants instead focus their argument on Plaintiff's adequacy considering his credibility issues. Specifically, Defendants argue that the inconsistencies in Plaintiff's prior testimony make him vulnerable to impeachment and therefore unsuitable as a class representative. In his Amended Complaint and the early stages of discovery, Plaintiff asserted that he did not understand what "legal action" Capital One referenced in the letter notifying him of his account closure; in his deposition, Plaintiff testified that he figured out his account was closed due to his son's convictions before receiving the letter from Capital One. *See* ECF 73-4 at Response No. 7; ECF 73-3 at 57:6-59:12.

Although credibility is relevant to determining the adequacy of a class representative, "only significant credibility concerns that 'go to the heart of the claims or defenses' at issue in the case will create a risk of inadequate representation." *Williams v. Sweet Home Healthcare, LLC*, 325 F.R.D. 113, 123 (E.D. Pa. 2018) (quoting *Sherman v. Am. Eagle Express, Inc.*, No. 09-575, 2012 WL 748400, at *7 (E.D. Pa. Mar. 8, 2012)). Exactly when Plaintiff became aware that the legal proceeding at issue related to his son does not go to the heart of the claim at issue here—namely, whether Defendants violated Section 1681e(c) by prohibiting Capital One from disclosing the contents of the GRID report to Plaintiff after Capital One closed his account. In the absence of more compelling evidence to the contrary, the Court finds that Plaintiff has shown by a preponderance of the evidence that he is an adequate class representative.

### 2. Ascertainability

Although the Court has already concluded that Plaintiff failed to satisfy Rule 23(a)'s numerosity requirement, it briefly addresses whether Plaintiff met another prerequisite to class certification under Rule 23(b)(3): ascertainability.

To demonstrate ascertainability, "[p]laintiffs must show that '(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469 (3d Cir. 2020) (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015)). Evidentiary support is required to satisfy the ascertainability requirement. *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 130 (3d Cir. 2023).

The facts that were fatal to Plaintiff's showing of numerosity produce the same outcome here. As in *In re Niaspan*, Plaintiff "assume[s] what [he] must prove"—that Capital One can feasibly identify individuals with addresses within the United States and its Territories whose accounts were closed *based on information in a GRID report*. *See In re Niaspan,* 67 F.4th at 135. The record shows that Capital One has closed accounts based on information from sources other than Defendants' GRID reports, but Capital One has not been able to identify the exact number of accounts that were closed based on those other sources. ECF 72-18 at ¶ 7. Under such circumstances, it cannot be said that the putative class is defined with reference to objective criteria.

Additionally, "[t]o identify the source of each closure, Capital One would have to manually review each file and seek that information from Defendants." ECF 72-18 at ¶ 8. Even if a manual review of the 19,133 accounts identified was possible, there is no indication it is administratively feasible. First, the records to be reviewed are in non-party Capital One's possession, custody, or

control—not Defendants. *See Kelly*, 47 F.4th at 223-24 (discussing a line of cases that "explained that putative classes are not ascertainable where either a defendant's records do not contain the information needed to ascertain the class or the records do not exist at all . . . ."). Second, in addition to reviewing each file, uncovering the basis for an account closure would require speaking with the investigator who made the ultimate decision. ECF 73-4 at 36:1-23; 81:3-9. Some of the investigators are Capital One employees, while others are third-party contractors. *Id.* at 36:24-37:7. Even further, many investigators are likely unavailable or inaccessible—the record already indicates that there are investigators based offshore in India, and some investigators are no longer employed with Capital One nor the third-party contractors. *Id.* at 37:8-14; 80:9-81:16.

As Defendants note, "such an inquiry for over 19,000 account closures is a far cry from the 'straightforward, 'yes-or-no review of existing records' that the Third Circuit has held to be feasible." *See* ECF 73 at 19 (quoting *Kelly*, 47 F.4th at 224). Identifying the putative class members would require extensive, individualized fact-finding, and compounding this problem is Plaintiff's failure to show a reliable and administratively feasible method for undergoing this determination.

Accordingly, Plaintiff has fallen short of establishing ascertainability. Like numerosity, ascertainability is a prerequisite to class certification under Rule 23(b)(3). Plaintiff's failure to satisfy each Rule 23 requirement by a preponderance of the evidence mandates denial of his motion for class certification. The Court therefore ends its analysis here.

## IV. CONCLUSION

The Court finds that Plaintiff has failed to meet Rule 23(a)'s numerosity requirement and Rule 23(b)(3)'s ascertainability requirement. As such, the Court denies Plaintiff's motion for class certification.